UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WASHINGTON, | No. 2:14-cv-0232 CKD P |
| Plaintiff, | |
| v. | <u>ORDER AND</u> |
| ANDREW NANGALAMA, et al., | <u>FINDINGS AND RECOMMENDATIONS</u> |
| Defendants. | |

Plaintiff is a California prisoner proceeding pro se with an action for violation of civil rights under 42 U.S.C. ¶ 1983. On April 22, 2014, the court screened plaintiff's first amended complaint as the court is required to do under 28 U.S.C. § 1915A. The court found service of process appropriate for defendants Nangalama and Wedell (defendants), both physicians employed at the California State Prison, Sacramento (CSPS), with respect to claims arising under the Eighth Amendment for denial of adequate medical care.  Defendants have filed a motion for summary judgment.

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

"citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or show that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

II. Plaintiff's Allegations

In his amended complaint, which is signed under the penalty of perjury, plaintiff alleges as follows:[1]

1. Sometime in the middle of 2011, plaintiff was diagnosed with having Chronic Inflammatory Demyelinating Polyneuropathy (CIDP), a disease which has no cure, but does respond to intravenous immune globulin treatment. The sooner treatment is administered the better. By the time plaintiff was diagnosed, he suffered from paralysis in both hands and both feet.

2. Sometime near the end of 2009, plaintiff began experiencing pain and numbness in his left hand. At that time, defendant Nangalama was plaintiff's primary care physician at CSPS. Over the course of the next year, plaintiff saw Dr. Nangalama on a "consistent basis" while the numbness and pain in his left hand increased. By the end of that period, plaintiff suffered from paralysis in his feet and hands. During this period plaintiff requested that both defendants provide plaintiff with a cane and wrist braces. Those requests were denied.

---

[1] The court omits allegations which are not relevant to plaintiff's remaining claims.

3. Between the time plaintiff began seeing Dr. Nangalama near the end of 2009 and the time he was properly diagnosed in the middle of 2011, Dr. Nangalama improperly diagnosed plaintiff as having arthritis, carpel tunnel syndrome, then a pinched nerve. Both defendants prescribed plaintiff Motrin-like painkillers based upon these diagnoses which were ineffective. Dr. Nangalama denied all of plaintiff's requests for "effective" pain medication. Plaintiff was not properly diagnosed until defendants referred plaintiff to a neuro-surgeon after plaintiff filed a prisoner grievance in December of 2010 complaining about his condition and lack of treatment.

4. By the time plaintiff was properly diagnosed, severe untreatable damage had been done by plaintiff's disease.

5. From the time plaintiff began seeing Dr. Nangalama near the end of 2009 until he was properly diagnosed, Nangalama would frequently refer to plaintiff as a "slickster" or accuse him of "faking" to try and get out of work or to obtain drugs.

6. Plaintiff claims he is "permanently disabled" as a result of his disease.

III. Standard Of Medical Care Under Eighth Amendment

The Eighth Amendment's prohibition of cruel and unusual punishment extends to medical care of prison inmates. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). In order to prove a section 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a prison inmate must point to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. A mis-diagnosis does not equal deliberate indifference. See Broughton v. Cutter Lab., 622 F.2d 458, 460 (9th Cir. 1980).

A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). Furthermore, mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). Where a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused

/////

1  "significant harm and that Defendants should have known this to be the case." Hallett v. Morgan,
2  296 F.3d 732, 745-46 (9th Cir. 2002).
3  III.  Defendants' Arguments And Analysis
4      Essentially, defendants argue that there is no evidence they were ever deliberately
5  indifferent to plaintiff's serious medical needs. Defendants present the affidavit of each
6  defendant.
7      In his affidavit (ECF No. 34-3), defendant Wedell asserts, in relevant part, as follows:

> While I was not Plaintiff's Primary Care physician, I was one of the physicians who saw plaintiff episodically between approximately October, 2009, and December, 2010, at CSP-Sacramento, when his primary care physician was unavailable. I may have seen him on occasion prior to or after these dates.
>
> Among other complaints, Plaintiff complained of weakness and numbness in his hands and fingers. These symptoms are consistent with a clinical diagnosis of carpel tunnel syndrome. A definitive diagnosis requires an EMG (Electromyography) with a nerve conduction study (NCS).
>
> Plaintiff suffers from [CIDP]. This serious disease is a rare neurological disorder in which there is inflammation of nerve roots and peripheral nerves . . .
>
> Diagnosis of . . . CIDP is based on history, clinical examination and supporting laboratory investigations. These include electromyography with nerve conduction studies, blood tests and analysis of spinal fluid. These are services provided by specialists, including a neurologist, to which Plaintiff was referred on multiple occasions.
>
> Plaintiff alleges we misdiagnosed his condition as carpal tunnel syndrome. However, on December 18, 2009, the Physical Medicine and Rehabilitation Electrodiagnostics specialist (Dr. Friend) conducted an electromyography (EMG) and nerve conduction study (NCS), based on a December 1, 2009, referral from Dr. Nangalama. In findings in Dr. Friend's report of December 19, 2009, as to Plaintiff's left arm and hand correlated [sic] with "compression of the nerve at the wrist." [Citation omitted.] Thus, on[e] of the earliest specialist referral resulted [sic] in the diagnosis of a possible "pinched" nerve. The April 16, 2010, EMG by Dr. Friend reported similar findings. [Citation omitted.]
>
> An MRI was performed of plaintiff on September 15, 2010 [citation omitted], at Dr. Nangalama's request. The report shows what was essentially a "pinched nerve" of the C4-5 cervical spine. . .
>
> On December 15, 2010, I made an urgent request for services for a referral to a neurosurgeon for consultation based on a dramatic

5

change in plaintiff's condition. Plaintiff had pain and numbness for over a year from what was believed to be, based on the prior diagnostic studies and specialist examinations, impingement of the nerve in his neck at C-7 and had a normal motor function examination when I saw him on October 1, 2010. When I saw him on December 15, 2010, he suddenly presented with a progressive loss of motor function that was not noted earlier. Plaintiff had decreased strength in his left triceps and wrist and left ankle.

This dramatic change in circumstances prompted me to make an urgent request for a referral to the neurosurgeon for evaluation. (I saw him again on December 31, 2010, 4 days before he was actually seen by the neurosurgeon and noted that he now had foot drop.) [Citation omitted.] . . .

At the time of the referral I also prescribed Plaintiff pain medication (Methadone 5 mgs for 7 days). He had a refill of the Methadone ordered by Dr. Dhillon on December 27, 2010. [Citation omitted.]

*Mr. Washington was seen by the neurosurgeon (Dr. Senegor) on January 4, 2011.[2] [Citation omitted.] After the neurosurgeon's examination, it was his opinion that Plaintiff would not benefit from surgical intervention. . . That neurosurgeon recommended that plaintiff be referred to a neurologist.[3]*

*Plaintiff was referred to the neurologist and was seen on February 9, 2011, by Dr. Remler at San Joaquin General Hospital. Dr. Remler's evaluation suggested a possible diagnosis of Guillain-Barre Syndrome or [CIDP], but that more tests needed to be done. [Citation omitted.]*

*On July 6, 2011, Plaintiff was seen by a Neurologist, Dr. Pineda. Based on his examination, Dr. Pineda favored a diagnosis of [CIDP.] Dr. Pineda also noted plaintiff was showing improvement. [Citation omitted.] . . .*

The diagnosis of [CIDP], a very rare disease, is a difficult diagnosis to make and can only be appropriately done by a specialist. Plaintiff's medical records reflect that among the specialists there was some early question as to whether or not plaintiff suffered from CIDP versus Guillain-Barre syndrome. When plaintiff was seen by Dr. Remler (neurologist) on February 9, 2011, and April 29, 2011,

---

[2] The portions of defendant Wedell's affidavit appearing in italics also appear in defendant Nangalama's affidavit.

[3] Plaintiff claims defendant Wedell ordered surgery for plaintiff and the surgery was cancelled upon the neurosurgeon's finding that surgery was not warranted. The court does not accept this assertion as it does not stand to reason that a general practitioner would order a surgeon to conduct surgery. A general practitioner refers a patient to a surgeon for evaluation for surgery and it is up to the surgeon to decide whether surgery should take place. Had Wedell knowingly provided false information to the neurosurgeon which resulted in unnecessary surgery, the Eighth Amendment would be implicated. That did not happen here.

that specialist found probably Guillain-Barre syndrome or CIDP, but given the "complexity of the EMG findings" felt that a second opinion was warranted. [Citation omitted.] On July 6, 2011, when he was seen by Dr. Pineda (neurologist), that specialist noted that it was an extremely close case of CIDP versus Guillain-Barre syndrome. Dr. Pineda favored CIDP but also said "the distinction is difficult." [Citation omitted.] On March 11, 2012, Plaintiff was seen by the Neurology resident for vision related problems who noted Plaintiff "likely has CIDP, though CIDP generally presents with symmetric symptoms and the patient's asymmetric neuropathy also raises the possibility of other potential causes . . ." [Citation omitted.]

In his affidavit (ECF No. 34-2), defendant Nangalama asserts, in relevant part, as follows:

> On October 22, 2009, in response to plaintiff's complaints of numbness in his left hand and wrist, I ordered an x-ray, ordered lab tests and changed his pain medication.
>
> On December 1, 2009, I referred Plaintiff to a neurologist for an electromyogram and nerve conduction studies (EMG/NCS), an electrical test of a patient's nerves and muscles which would identify where the symptoms are coming from. [Citation omitted.] The EMB/NCS was conducted on December 18, 2009. I had no reason to believe that Mr. Washington was faking his symptoms and did not believe that he was.
>
> I saw and examined plaintiff again on January 20, 2010, following up to the EMG conducted approximately two weeks prior. At the time the report from the specialist was still pending and plaintiff did not report any new complaints and his pain seemed to be controlled with current medications, so I renewed his medications and scheduled a follow-up. [Citation omitted.]
>
> On March 3, 2010, I saw Plaintiff again for a follow-up to the EMG/NCS (plaintiff had not shown up for a February 10, 2010, appointment . . .). The neurologist, Dr. Friend, concluded that the neuropathy in Plaintiff's hand likely resulted from nerve compression in his wrist or carpel tunnel syndrome. [Citation omitted.] On this date I also ordered an x-ray of his cervical spine. [Citation omitted.] At this point, the diagnosis of Carpal Tunnel Syndrome was supported by the findings of the specialist/neurologist.
>
> On March 20, 2010, Plaintiff received the x-rays I had ordered of his cervical spine. [Citation omitted.] As a result, I referred him for an MRI which was conducted September 15, 2010. [Citation omitted.]
>
> [Defendant Nangalama reiterates those portions of defendant Wedell's declaration identified above in italics.]
>
> I do not recall how often Plaintiff complained of pain, but in addition to the pain medications referenced above, on October 22,

7

> 2009, I prescribed Salicylates and Ibuprofen which are anti-inflammatory medication (citations omitted). . . On December 1, 2009, I also prescribed Gabapentin for neuropathy pain (citation omitted). . .
>
> My treatment plan for Mr. Washington involved investigating the cause of the worsening weakness in his left arm and leg. I ordered blood work to rule out any abnormalities, and ordered X-rays and physical therapy. I also referred him out for a neurology consultation, and followed the recommendations of the specialist such as ordering an EMG/NCS, and further consults to determine the cause of Plaintiff's condition. Eventually, I transferred him out of general population to a higher level of care. Plaintiff received advanced care and treatment and improved accommodations at the Out-Patient Housing Unit (OHU). [Citation omitted.] He also received chronos to provide a walker and a lower bunk bed, and there were no stairs in the OHU facility.
>
> . . . The diagnosis of [CIDP] is a difficult diagnosis to make and can only be appropriately done by a [neurologist]. . .
>
> . . . I made multiple specialist referrals, including urgent referrals, and never accused plaintiff of "faking" his symptoms as there was no reason to believe that he was. . .

After reviewing all of the evidence before the court and construing the evidence in the light most favorable to plaintiff, the court will recommend that defendants' motion for summary judgment be denied.

While it is clear that defendants provided significant attention to plaintiff over the course of the approximately 18 month period of time identified by plaintiff in his first amended complaint, and that defendants were not deliberately indifferent in trying to identify what was wrong with plaintiff, facts presented by plaintiff regarding the treatment provided to plaintiff for his pain and mobility problems preclude summary judgment for defendants. Specifically, plaintiff asserts the pain medication he was given was not effective, that he told defendants this, and yet they refused to provide other medications. He also requested that he be allowed to use a cane and wrist braces, seemingly reasonable requests for a person with severe numbness in his feet and hands, yet those requests were never granted.

So, while the evidence before the court demonstrates that defendants were not indifferent to finding out what was wrong with plaintiff, there are at least genuine issues of material fact as to

/////

whether the treatment of plaintiff's symptoms while defendants sought a diagnosis amounted to deliberate indifference to a serious medical need.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court assign a district court judge to this case.

IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 34) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991)..

Dated:  January 12, 2016

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
wash0232.57